**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **CAROLYN A. DEAVER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:07-CV-158-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pursuant to the consent of the parties and the District Court's *Order of Reassignment*, dated February 28, 2008, this case has been transferred to the undersigned United States Magistrate Judge for the conduct of all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c). Before this court are the *Brief for Plaintiff*, filed April 4, 2008, and *Defendant's Brief*, filed May 2, 2008. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the court orders that the final decision of the Commissioner be **REVERSED** and the case **REMANDED** to the Commissioner for further administrative proceedings.

## I. BACKGROUND[1]

### A.   <u>Procedural History</u>

Carolyn Ann Deaver ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under

---

[1]  The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Title II and Title XVI of the Social Security Act. On July 20, 2004, Plaintiff filed applications for disability insurance benefits ("DIB") and supplementary security income ("SSI"). (Tr. at 61-63, 251-55). Plaintiff claimed she had been disabled since February 1, 2004, due to aschemic bowel, stomach pain, diarrhea, nausea, vomiting, swollen and painful joints, back pain, hip pain, and an autoimmune disease. (Tr. at 61, 251, 94-95). Her application was denied initially and upon reconsideration. (Tr. at 29, 37). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 19). Plaintiff personally appeared and testified at a hearing held on June 21, 2006. (Tr. at 19, 57). On November 21, 2006, the ALJ issued her decision finding Plaintiff not disabled. (Tr. at 16-24). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 6-8). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 6). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on December 4, 2007.

**B.    Factual History**

**1.    Age, Education, and Work Experience**

Plaintiff was born in 1952 and was fifty-four years old at the time of the hearing. (Tr. at 276). She is a high school graduate and completed about three semesters of college studying computer programs. (Tr. at 276). Her past relevant work experience includes work as a sales clerk, manager, customer service representative, typesetter, general clerk, general office clerk, and sewing machine operator. (Tr. at 301-03). Plaintiff last worked in 2004. (Tr. at 284).

**2.    Medical Evidence**

Plaintiff's relevant medical history began on February 20, 2004, when she complained of

chest pains, anxiety, insomnia, and severe leg cramps to her treating physician, Dr. Gary T. Evans, M.D. (Tr. at 244). Dr. Evans admitted Plaintiff to Bowie Memorial Hospital in Bowie, Texas, where he diagnosed her with hypertension, insomnia, leg cramps, and chest pains that were "non-cardiac in origin" and "mostly musculoskeletal." *Id.* Hospital records from the visit reveal that Dr. Evans considered Plaintiff to be "significantly obese weighing about 340 lbs" with a height of about five feet and six inches. (Tr. at 245). The hospital discharged Plaintiff on February 22, 2004. *Id.*

On March 5, 2005, Plaintiff visited Dr. Evans again, complaining of fever, chest congestion, and vomiting. (Tr. at 161) Dr. Evans again admitted Plaintiff to Bowie Memorial Hospital, where he, in surgical consultation with Dr. S.S. Aujula, M.D. diagnosed acute cholecystitis, cholelithiasis, splenomegaly, and hypertension.[2] (Tr. at 161, 236-40). The diagnosis included thrombocytopenia and leukopenia as secondary to the gallstone problem.[3] (Tr. at 236). Hospital records from the visit reveal that Dr. Aujula considered Plaintiff to be "grossly obese." (Tr. at 239). On March 10, 2004, based on her improved condition, Plaintiff was discharged from the hospital and scheduled for a follow-up clinical appointment and possible surgical consultation. *Id.*

On March 19, 2004, Plaintiff saw Dr. D. Blain Laws, M.D. "for continued nausea and vomiting" and for being "unable to keep anything down." (Tr. at 160). He noticed tenderness in her upper quadrant and sent her to the ER for treatment with normal saline bolus, IV Phenegran, and

---

[2] Acute cholecystitis is a sudden inflammation of the gallbladder. Cholelithiasis is another name for gallstones. Splenomegaly is an enlargement of the spleen beyond its normal size. Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Oct. 1, 2008).

[3] Thrombocytopenia is any disorder in which there are not enough platelets or cells that help blood-clotting. Leukopenia is a condition in which the number of white blood cells circulating in the blood is abnormally low. *Id.*

Phenegran suppositories.  *Id.*

On March 22, 2004, Plaintiff saw Dr. Aujula for "continued upper abdominal pain, nausea and vomiting," and for being unable to "keep anything down."  (Tr. at 159).  Dr. Aujula noted that despite the previous diagnosis of thrombocytopenia, Plaintiff's platelet count had improved. *Id.* Upon physical examination, he also noted Plaintiff's "morbidly obese abdomen." *Id.*  Dr. Aujula arranged "to carry out a fairly urgent laparoscopic cholecystectomy"[4] on Plaintiff the next morning. *Id.*

On March 23, 2004, Plaintiff was admitted to Bowie Memorial Hospital, where Dr. Aujula performed a laparoscopic cholecystectomy.  (Tr. at 214).  Dr. Aujula noted that the "incidence of post operative complications [was] expectedly higher in someone who" had Plaintiff's co-existing morbid obesity and hypertension.  (Tr. at 213).  On March 24, 2004, Plaintiff was discharged from the hospital based on her "uneventful" post operative recovery.  (Tr. at 214).  On March 31, 2004, in a follow-up appointment with Plaintiff, Dr. Aujula noted that Plaintiff was doing very well, had no nausea or upper abdominal discomfort, and had normal bowel function.  (Tr. at 158).  However, he "encouraged her to continue on a weight loss program."  *Id.*

On July 8, 2004, Plaintiff visited Dr. Evans complaining of abdominal pain, nausea, vomiting, and "a little bit of fever and chills."  (Tr. at 157).  Dr. Evans observed that she had pain in the epigastrium and that her abdominal pain was "similar to what she had before she had her gallbladder out."  *Id.*  Her chest, heart and abdominal exams were unremarkable.  *Id.*  Dr. Evans ordered tests and prescribed medication.  *Id.*  On July 12, 2004, Plaintiff again visited Dr. Evans for

---

[4]   Cholecystectomy is a surgical excision of the gallbladder.  Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Oct. 1, 2008).

a follow up appointment. (Tr. at 156). She still had pain in her stomach and a little bit of diarrhea but no fever and chills. *Id.* Her chest, heart, and abdominal exams were unremarkable. *Id.* Dr. Evans added medication to her original prescription. *Id.*

On July 13, 2004, Plaintiff saw Dr. Evans again, citing increased abdominal discomfort and pain, vomiting, and diarrhea. (Tr. at 155). Dr. Evans admitted her to Bowie Memorial Hospital for further evaluation and treatment. (Tr. at 155, 203). During her six-day stay at the hospital, Plaintiff was diagnosed with hypertension, morbid obesity, severe leukopenia and thrombocytopenia. (Tr. at 202). Dr. Evans noted that Plaintiff's abdominal pain, fever, vomiting and diarrhea were possibly secondary to her severe leukopenia and thrombocytopenia. *Id.* Despite receiving twelve packs of platelets, IV fluids, and antibiotics, Plaintiff did not significantly improve over the next several days. *Id.*

On July 19, 2004, concerned that Plaintiff might have acute leukemia,[5] the hospital transferred her to the care of Dr. P. Robert Delizio, M.D. at the Wichita Falls Regional Health Center for an oncology and hematology evaluation. (Tr. at 202, 118). Dr. Delizio noted that Plaintiff had widespread bruising and low white cell count, but no leukemia. (Tr. at 116-17). He also noted that Plaintiff had "leukopenia and thrombocytopenia of uncertain etiology," and that the exact cause of her symptoms and syndrome was unknown. (Tr. at 117-18). Dr. Delizio started Plaintiff on IV fluids and a transfusion of platelets. (Tr. at 118). On July 31, 2004, Plaintiff was discharged from the hospital based on her improved condition. (Tr. at 116-17). Dr. Delizio, however, arranged to see Plaintiff as an outpatient because even though her platelet count was

---

[5] Leukemia involves an abnormal increase in the number of white blood cells in the tissues of the body with or without a corresponding increase of those in the circulating blood. Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Oct. 1, 2008).

recovering, her white cell count had already begun "to drift downward." (Tr. at 117).

On August 9, 2004, Plaintiff visited Dr. Evans for a follow up of her recent hospitalization, and he noted that her bruises were resolving and she seemed to be doing much better even though she still had pain when she ate. (Tr. at 155). On August 17, 2004, Plaintiff had a second follow-up with Dr. Delizio where she complained of a macular skin rash over her upper extremities. (Tr. at 170). Dr. Delizio noted that the extensive blood and other studies performed on Plaintiff during her recent hospitalization were all within normal limits, and that Plaintiff had a "history of transient thrombocytopenia and neutropenia[6] of uncertain etiology." *Id*. Dr. Delizio planned to continually observe Plaintiff and recheck her in three months. *Id*.

On September 2, 2004, Plaintiff returned to Dr. Evans for another follow-up. (Tr. at 154). Dr. Evans noted that Plaintiff's blood count was staying up and that her white count had been in the normal range. *Id*. He also noted that Plaintiff was feeling a little bit better even though she had abdominal pain from time to time. *Id*. Plaintiff's examination was unremarkable except for an infected lesion on the leg. *Id*.

On October 8, 2004, Plaintiff again visited Dr. Evans stating that she had been "bruising a little bit more easily" in the past few days. (Tr. at 153). Plaintiff's chest, heart and abdominal exams were unremarkable and there was "no evidence of [a] significant blood abnormality." *Id*. Dr. Evans' impression was that Plaintiff had "a lupus-like syndrome."[7] *Id*.

On November 16, 2004, Plaintiff visited Dr. Delizio with a singular complaint of

---

[6]  Neutropenia is a kind of leukopenia. Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Oct. 1, 2008).

[7]  Lupus is a chronic, inflammatory, autoimmune disorder which may affect the skin, joints, kidneys, and other organs. *Id*.

"intermittent muscle cramps" involving her lower extremities, "particularly during the night hours."
(Tr. at 165). Dr. Delizio noted that Plaintiff's general condition, including her history of abdominal
pain had improved, and that her transient leukopenia and thrombocytopenia had resolved. (Tr. at
165-66). He also noted that Plaintiff had gained six pounds since her last visit putting her at 321.2
pounds and that this weight-gain was "without an onset of peripheral edema."[8] (Tr. at 165). Dr.
Delizio prescribed a sleep aid that could also help Plaintiff with her "possible neuropathic leg pain."
(Tr. at 166). Given Plaintiff's normal blood count, Dr. Delizio advised her to call if needed. *Id.*

On August 22, 2005, Plaintiff visited Dr. Evans, who noted that Plaintiff was "having quite
a bit of trouble with pain in her joints" with the pain moving around "from her knees to her hips to
her lower back and then shoulders." (Tr. at 175). Plaintiff stated that she was "bruising a little more
easily." *Id*. Her chest, heart, and abdominal exams were clear and she was given a shot of Depo
Medrol, a steroid. *Id*. Dr. Evans noted that her symptoms sounded like arthralgias and prescribed
medication.[9] *Id*. He planned to follow-up in the next ten to fourteen days. *Id*.

On August 26, 2005, Plaintiff saw Dr. Delbert McCaig, D.O. and reported that she had been
sweating, shaking, and nearly passing out four to five times a day. (Tr. at 174). She also reported
that her back, hips, and legs had improved over the past year. *Id*. Dr. McCaig noted that Plaintiff's
symptoms were possibly caused by "either a mild viral illness, medications or being out in the heat."
*Id*. He advised her to increase her fluid intake and prescribed her Medrol Dosepak. *Id*.

On August 30, 2005, Plaintiff visited Dr. Evans for a follow-up appointment. (Tr. at 173).

---

[8] Peripheral edema is an alternative name for ankle, foot, and leg swelling due to abnormal fluid buildup in
these areas. Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last
visited Oct. 1, 2008).

[9] Arthralgia is pain in one or more joints. *Id*.

During the visit, Dr. Evans observed that the previously prescribed Medrol had made a difference in the way Plaintiff felt. *Id*. He also noted that Plaintiff's "recent lab tests looked fairly unremarkable" and that her chest, heart and abdominal exams were unremarkable. *Id*. He prescribed medicine for reflux and a month's supply of Prednisone. *Id*.

On September 27, 2005, Dr. Evans summarized Plaintiff's medical history in a letter. (Tr. at 172). It stated that Plaintiff had been followed in his clinic for hypertension and gastroesophageal reflux disease. *Id*. It also stated that Plaintiff's previous problems with thrombocytopenia and leukopenia associated with abdominal pain had been resolved and that plaintiff was very stable and doing well recently. *Id*. Dr. Evans further noted that Plaintiff was taking Lotrel for hypertension, Prevacid for reflux, Dyazide for edema, and Hydrocodone for severe pain. *Id*.

On January 18, 2006, Plaintiff was seen at the Canadian Valley Clinic in El Reno, Oklahoma. (Tr. at 178-80). Examination notes, which are somewhat unclear, seem to state that Plaintiff was having back pain, leg pain, and hoarseness. (Tr. at 180). They also state that Plaintiff appeared to be "leg stiff." *Id*. Diagnostic impressions in the notes mention lupus, hypertension and thrombocytopenia. *Id*. Her weight was noted to be 320 pounds. *Id*.

On February 8, 2006, a chest X-ray performed on Plaintiff at Park View Hospital in El Reno, Oklahoma showed "degenerative changes of the spine." (Tr. at 177).

### 3.    Hearing Testimony

A hearing was held before the ALJ on June 21, 2006. (Tr. at 274). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. *Id*.

### a.    *Plaintiff's Testimony*

Plaintiff testified that she was fifty-four years old, weighed 320 pounds and was five feet and

six inches tall.  (Tr. at 275-76).  She testified that she had completed high school and about three semesters of college studying computer programs.  (Tr. at 276).  Plaintiff stated that she resided with her retired sixty-eight year old husband who was disabled to such an extent that he could not walk at all, was in a wheel chair, and needed help with bathing and dressing.  (Tr. at 293, 301).  Plaintiff and her husband were both residents of Bowie, Texas, from February 1 to October 2005.  (Tr. at 293-94).  In October 2005, they relocated to El Reno, Oklahoma to take advantage of a much shorter waiting list to receive housekeeping assistance for the disabled provided by the Department of Human Services.  (Tr. at 300).  Three months after they relocated, Plaintiff's husband started receiving that assistance.  (Tr. at 294).

Plaintiff also testified that between 1990 and her last job in 2004, she worked as a sales clerk, manager, customer service representative, typesetter, general clerk, substitute teacher, and sewing machine operator.  (Tr. at 277-84).  She stated that she had not collected any unemployment benefits between April 2004 and the time of the hearing.  (Tr. at 293).

Plaintiff identified back pain, muscle spasms, muscle cramps, and swollen and painful joints as conditions impairing her ability to work.  (Tr. at 284-85).  She testified that her back pain would not allow her to bend, stoop, stand, or lift things.  (285-286).  As a result, she could only walk or stand for 15 to 30 minutes, and sit for 30 to 45 minutes without needing to take a break.  (Tr. at 286).  Plaintiff also testified that the swelling and inflammation in her joints, caused by lupus, would not allow her to bend her ankles.  (Tr. at 285-88).  Consequently, Plaintiff tripped and could not walk a block without needing to stop and rest.  (Tr. at 287).  Further, she used an electric cart to avoid walking at the grocery store.  (Tr. at 292).  Plaintiff reported that muscle spasms and tightening in her hands would not let her type or play the organ for more than thirty minutes.  (Tr. at 284-85).

Even playing or typing for this limited amount of time would subsequently cause severe pain and tightening in her hands.  (Tr. at 285-86).  Plaintiff stated that the pain in her back and hips would not let her rest or sleep.  (Tr. at 285).  She had to constantly change positions and sleep in a recliner most of the time.  *Id*.  Plaintiff testified that she was taking some medication for her joint pain but the medication prevented her from driving.  (Tr. at 288).

Concerning her history of severe abdominal pains, Plaintiff testified that a majority of the time she had stomach pains immediately after she ate, and her bowel function fluctuated between severe constipation and severe diarrhea.  (Tr. at 287-288).  She also stated that she experienced nausea and vomiting.  (Tr. at 287).  In order to deal with her stomach pain and nausea, Plaintiff watched her diet and took medication respectively.  (Tr. at 287).  The medication left her sleepy and unable to drive.  (Tr. at 289).

Plaintiff testified that on a typical day, she dressed, showered and fixed her hair, and spent the remainder of her time either reading or moving back and forth between housekeeping and resting.  (Tr. at 289, 291).  Even though she could cook some quick-fix meals, she was unable to vacuum, dust or wash dishes, and the housekeeper provided for her disabled husband did the house work for both of them three hours a day, five days a week.  (Tr. at 289, 300).  Plaintiff stated that she slept three to five hours on an average day and that most of the time her sleep was not continuous. (Tr. at 290).  Plaintiff estimated that she had three to four "bad" days a week where her ability to move around was restricted by her swollen joints and her medication.  (Tr. at 291).  On some of these days, she was unable to get out of bed, and even if she was able to do so, she could only do light things like bathing, dressing herself, and fixing her hair.  (Tr. at 291-92).  On some really bad days, she could not even fix her hair on her own.  (Tr. at 289).

Plaintiff further testified that she went to church twice every week, on Wednesdays and Sundays. (Tr. at 289, 295). The Sunday service was two to two and a half hours long, while the Wednesday service lasted an hour and a half at the most. (Tr. at 290, 295). Plaintiff remained at the church for the entire service. (Tr. at 296). At the service, she sat down for about thirty to forty minutes, and stood in the back for about ten to fifteen minutes before she sat down again. (Tr. at 290). Twice a month, she sang solo at the church. (Tr. at 295-96).

Regarding her driving history, Plaintiff testified that she paid her bills by mail to avoid getting out of the house, but that she drove to Wal-Mart two to three times a week. (Tr. at 292, 295). Plaintiff reported that between February 2004 and October 2005, when she was a resident of Bowie, Texas, she did not travel out-of-state. (Tr. at 297). Her travel during that time consisted of trips to see family in Texas, including her daughter in Electra, Texas. *Id*. The trips to Electra were less than an hour long. (Tr. at 298). Plaintiff further testified that as a resident of Oklahoma, between October 2005 and June 2006, she and her husband made a trip to Bowie, Texas, where they stayed overnight, and two two-hour trips to Electra, Texas. (Tr. at 292, 298-99). During those trips, she and her husband took turns driving, and she took breaks to spend some time out of the car. (Tr. at 292, 299). Plaintiff did not make any other out-of-state trips during that time period. (Tr. at 300). However, she traveled within Oklahoma to Oklahoma City twice. *Id*.

### b. *Vocational Expert Testimony*

Dr. Robert Sanders, a VE, also testified at the hearing. The VE classified the exertional demands and skill requirements of a sales clerk as light and semi-skilled with a Specific Vocational preparation ("SVP") of three. (Tr. at 302). He classified a manager as light and skilled with an SVP of seven. *Id*. He classified a customer services representative as sedentary and low-skilled with an

SVP of five.  *Id.*  He classified a typesetter as light and semi-skilled with an SVP of four.  *Id.*  He testified that a general clerk was classified as light and semi-skilled with an SVP of three.  (Tr. at 303).  The VE classified a sewing machine operator as light and unskilled with an SVP of two.  *Id.*  Responding to the ALJ, the VE opined that Plaintiff's skills from her general clerical work and customer services representative work were directly transferable to other job families as well as to sedentary work.  (Tr. at 303-04).  Sedentary jobs included receptionist and payroll clerk, both of which were semi-skilled with an SVP of four.  (Tr. at 304).  There was a conservative estimate of over 25,000 receptionist jobs and over 50,000 payroll clerk jobs in the region of Oklahoma and Texas, and an estimate of over 800,000 receptionist jobs and over a million payroll clerk jobs in the U.S. economy.  *Id.*

In response to hypothetical questions which assumed an individual with Plaintiff's age, education, and past relevant work, the VE opined that such an individual could perform Plaintiff's previous work as general clerk, sewing machine operator, customer service representative, and typesetter if he had an exertional limitation of light and only occasionally have to climb, balance, kneel, crouch, crawl, and stoop.  (Tr. at 304-05).  The individual could also perform this work with an exertional limitation of light; occasional climbing, kneeling, crouching, crawling, stooping; frequent reaching; and frequent handling, fingering, and feeling for both hands.  (Tr. at 305).  However, the individual could not perform this work or other transferable skilled jobs on a sustained competitive basis, if the exertional limitation was changed to light, occasional balance, kneel, crouch, crawl, stoop, occasional reach, handle, finger, and feel with both hands.  (Tr. at 305-06).

The VE also opined that if the individual had an exertional limitation of sedentary and occasional climbing, balancing, kneeling, crouching, crawling, and stooping, he could only perform

Plaintiff's previous work as customer service representative. *Id.* The individual could still perform Plaintiff's previous work as customer service representative if the exertional limitation was changed to sedentary; occasional climbing, balancing, kneeling, crouching, crawling, stooping; frequent reaching, handling, fingering, and feeling with both hands. (Tr. at 305-06). When the exertional limitation was changed to sedentary; occasional climbing, balancing, kneeling, crouching, crawling, stooping; occasional reaching, handling, fingering, and feeling with both hands, the hypothetical individual could not perform Plaintiff's past relevant work. (Tr. at 306). Additionally, no transferable skill jobs could be performed with such an exertional limitation. *Id.* Finally, if the exertional and non-exertional limitations created a residual functional capacity that was less than sedentary and unable to complete an eight-hour work day or a five-day work week in the competitive work force, the hypothetical individual could not perform Plaintiff's previous work. (Tr. at 307).

## C.     ALJ's Findings

The ALJ denied Plaintiff's application for disability benefits under Title II and Title XVI of the Social Security Act by written opinion on November 21, 2006. (Tr. at 24). The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2008, and that she had not engaged in substantial gainful activity since February 1, 2004, the alleged onset date. (Tr. at 21, ¶¶1, 2). The ALJ also found that Plaintiff had a medically determinable impairment of leukopenia and thrombocytopenia. (Tr. at 21, ¶3). The ALJ found, however, that Plaintiff's impairment or combination of impairments was not severe because it had not significantly limited or was expected to significantly limit her ability to perform basic-work related activities for twelve consecutive months. (Tr. at 21, ¶4). The ALJ found that Plaintiff's medically determinable

impairment could reasonably be expected to produce the symptoms alleged by Plaintiff. (Tr. at 22). She found, however, that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. *Id.*

The ALJ concluded that Plaintiff's leukopenia and thrombocytopenia had resolved within a few months and had not recurred. (Tr. at 24). Plaintiff had not required further treatment for these conditions, and treatment had been routine and conservative. (Tr. at 23). The ALJ further found that even though Plaintiff had been treated for her joint pain, she had reported improvement over the past year in her back, hips, and legs. *Id.* Additionally, Plaintiff had reported some relief with medication, and the tests performed had been unremarkable. (Tr. at 24). The ALJ also found that treatment records did not corroborate Plaintiff's allegations of side effects from her medication. *Id.* Since her last hospitalization in June 2004, Plaintiff had not complained or sought treatment for diarrhea. *Id.* She was taking Prevacid for reflux but no other medication for a stomach condition. *Id.* The ALJ also found that based on the weak medical evidence and other factors, Plaintiff's characterization of her activities as fairly limited was not credible. *Id.* Plaintiff cared for her personal needs, attended church, sang at church, and shopped for groceries using a cart. *Id.* Plaintiff did not do any house work because a housekeeper came in three hours a day five days a week to care for her disabled husband. *Id.* The ALJ also noted that no treating source had imposed any work-related limitations on the Plaintiff. *Id.*

## II. ANALYSIS

### A. <u>Legal Standards</u>

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issue for Review**

Plaintiff alleges that the ALJ's finding of no severe impairment or combination of impairments is not supported by substantial evidence and results from prejudicial legal error. (Pl. Br. at 1).

**C.      Issue: Severe Impairment**

Plaintiff contends that at the second step of the five-step analysis, the ALJ's finding of no severe impairment is legally erroneous and unsupported by substantial evidence. (Pl. Br. at 13-14). More specifically, Plaintiff alleges that the ALJ found only one medically determinable impairment in this case: a history of leukopenia and thrombocytopenia, when medical evidence supports a finding of obesity as another such impairment. *Id.* Plaintiff also alleges that there is objective medical evidence supporting the presence of a musculoskeletal impairment. (Pl. Br. at 16).

**1.      The *Stone* Standard**

 Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation includes fewer conditions than indicated by the statute. *Stone  v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. Additionally,

the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give 20 C.F.R. § 404.1520(c) (1984) is used." *Id*. at 1106; accord *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000); *Eisenbach v. Apfel*, 2001 WL 1041806, at *6 (N.D. Tex. Aug. 29, 2001) (Boyle, J.). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Secretary for reconsideration. *Stone*, 752 F.2d at 1106.

In this case, the ALJ cited the Social Security regulation's definition for a severe impairment that "an impairment or combination of impairments is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (Tr. at 20) (citing 20 C.F.R. § 404.1520(c)). The ALJ also stated that "an impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (Tr. at 20). Under *Stone*, however, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." Unlike the standard applied by the ALJ, *Stone* provides no allowance for a minimal interference on a claimant's ability to work. It is clear that the ALJ's

construction did not expressly state the *Stone* standard or another opinion of the same effect. Nor did the ALJ make any express statement indicating use of the *Stone* definition of severity. Consequently, the Court presumes that the ALJ applied an incorrect standard of severity at step two of the five-step analysis.

Additionally, the ALJ did not mention Plaintiff's obesity and muskoskeletal problems. At the very onset of her medical history, Dr. Evans noted in hospital records that Plaintiff was "significantly obese," weighing about 340 pounds with a height of about five feet and six inches. (Tr. at 245). In later hospital records, he also diagnosed her with "morbid obesity." (Tr. at 202). Another treating physician, Dr. Aujula, also noted in hospital records as well as in follow-up appointment records, that Plaintiff was "grossly obese" and had a "morbidly obese abdomen." (Tr. at 239, 159). There was also some evidence as to how her obesity allegedly affected her daily activities. Dr. Aujula, after performing a laparoscopic cholecystectomy on Plaintiff, noted that the "incidence of post operative complications [was] expectedly higher in someone" who had Plaintiff's co-existing morbid obesity and hypertension. (Tr. at 213). During a post-surgery follow-up appointment, Dr. Aujula also "encouraged her to continue on a weight loss program." (Tr. at 158). These statements, in conjunction with Plaintiff's testimony about her physical limitations, constituted some evidence as to how her obesity allegedly affected her daily activities. (Tr. at 284-300).

Similarly, there was also evidence that could support a finding of musculoskeletal impairments. At the onset of her medical history, Dr. Evans noted that Plaintiff's hypertension, insomnia, leg cramps, and chest pains were "mostly musculoskeletal." (Tr. at 244). An x-ray performed on Plaintiff almost a year later showed "degenerative changes of the spine." (Tr. at 177).

This evidence, combined with Plaintiff's testimony about her physical limitations, constituted some evidence that her musculoskeletal impairment was severe. There is also evidence that Plaintiff's alleged impairments lasted or were expected to last twelve consecutive months.[10] The ALJ's opinion reflects no consideration of the alleged severe impairments of obesity and musculoskeletal problems.

Generally, appeals from administrative agencies of a procedural error will not lead to a vacated judgment "unless the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam)). However, the ALJ's failure to apply the *Stone* standard was a legal error, not a procedural error. The Fifth Circuit left the lower courts no discretion to determine whether such an error was harmless. Rather, the court mandated that "[u]nless the correct standard is used, the claim must be remanded to the secretary for reconsideration." *Stone*, 752 F.2d at 1106 (emphasis added). Here remand is required at step two.

## 2. Defendant's Arguments

Defendant contends that the ALJ properly determined at step two that Plaintiff did not have a severe impairment. (Def. Br. at 3). Defendant's contention is misplaced for two reasons. First, judicial review entails an evaluation of whether the Commissioner applied the correct legal standard in addition to whether substantial evidence supports the decision. *Greenspan*, 38 F.3d at 236. As discussed previously, the ALJ applied the incorrect legal standard when she evaluated Plaintiff's

---

[10]  In its brief, Defendant incorrectly relies on the ALJ's decision that Plaintiff's medically determinable impairment of severe thrombocytopenia and leukopenia did not last twelve consecutive months. (Def. Br. at 6-7). Plaintiff here contends that the ALJ ignored obesity and musculoskeletal problems, not thrombocytopenia and leukopenia, as possible impairments. Obesity, in Plaintiff's case, lasted 12 consecutive months. In response to Plaintiff's very first complaints on February 20, 2004, Dr. Evans noted that Plaintiff was significantly obese. On January 18, 2006, Plaintiff was still obese weighing about 320 pounds with a height of 5 feet, 6 inches and with a Body Mass Index of 51.6. *See* Tr. at 180; *see also* Calculate Your Body Mass Index, National Institute of Health, *available at* http://www.nhlbisupport.com/bmi/ (last visited Oct. 1, 2008). Evidence also shows that Plaintiff's alleged musculoskeletal problems lasted or were expected to last twelve consecutive months. (Tr. at 244, 177).

severe impairments. Second, given the low bar for the establishment of a severe impairment, Plaintiff presented evidence that could support a finding of obesity and musculoskeletal problems as severe impairments. Defendant's argument for affirming the ALJ's decision on the evidence in the record is therefore unavailing.

Defendant next argues that while the ALJ did not specifically address Plaintiff's weight as an issue, the ALJ clearly stated that she considered all the evidence of record in finding that Plaintiff had no severe impairment or combination of impairments. (Def. Br. at 10). The ALJ's opinion makes no reference to obesity whatsoever even when summarizing the medical evidence from the record, however. Additionally, the overall construction of the ALJ's opinion suggests that she omitted obesity altogether as a possible severe impairment.

Defendant also contends that the ALJ fully and fairly developed the record regarding Plaintiff's obesity. (Def. Br. at 8). Defendant relies on *Carey v. Apfel*, which holds that to support remand based on a failure to fully develop the record, a disability claimant must show that the ALJ's failure prejudiced the claimant. 230 F.3d 131, 142 (5th Cir. 2000). To establish prejudice, the claimant must show that she "could and would have adduced evidence that might have altered the result" reached by the ALJ. *Id.* (citing *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)). In *Carey*, the Fifth Circuit held that claimant was not prejudiced by a medical expert's inaccurate summary of medical records because the court had those medical records before it when it made its decision, and there was no indication in the record that the ALJ had relied on the objectionable portions of the medical expert's testimony. *Id.* The Fifth Circuit specifically pointed to the fact that the ALJ's decision began with a detailed and entirely accurate summary of claimant's medical records. *Id.* at 143. In comparison, the ALJ in this case failed to include opinions from two credible

medical sources concerning Plaintiff's obesity in her very detailed summary of Plaintiff's medical records without providing any justification. Plaintiff was prejudiced by this failure because had the ALJ properly considered this evidence available to her, it might have altered her finding of no severe impairment. Based on these reasons, the court disagrees with Defendant's argument that the ALJ fully and fairly developed the record.

Defendant further argues that Plaintiff waived her right to raise obesity as a basis for remand. (Def. Br. at 9). More specifically, Defendant argues that given ample opportunity to do so, Plaintiff failed to raise the issue of obesity in her application for disability, during the administrative hearing, and in her request for review of the administrative decision. (Def. Br. at 8-9). Defendant cites *Perez v. Barnhart*, where the Fifth circuit ruled that a claimant could not raise an alleged defect as an issue at the district court, when his counsel deliberately did not exercise his right to do so at the administrative hearing. 415 F.3d 457 (5th Cir. 2005). In *Perez*, the ALJ relied on claimant's testimony in response to an incorrectly worded hypothetical question about her education despite contrary evidence presented to him, and claimant's counsel did not try to correct the question or present one of his own. *Id*. at 463. In contrast, this case does not involve the ALJ dealing with conflicting evidence concerning Plaintiff's obesity. It simply involves the ALJ's failure to consider evidence about Plaintiff's alleged obesity that was properly presented to her in the form of medical records. Additionally, in making its decision in *Perez*, the Fifth Circuit specifically relied on the fact that the ALJ's finding was supported by substantial evidence. *Id*. As pointed out earlier, the ALJ's decision in this case is not supported by substantial evidence. Defendant's argument under *Perez* therefore also fails.

In conclusion, the ALJ provides no indication that she applied the correct legal standard as

set forth in *Stone*. The Commissioner's arguments are not persuasive, and this case shall be remanded with directions to the ALJ to apply the correct legal standard for severity as set forth in *Stone* and consider the alleged severe impairments of obesity and muskoskeletal problems.

### III.    CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **REVERSED** and the case is hereby **REMANDED** pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings. On remand, the Commissioner should begin the disability analysis at step two of the sequential five-step disability inquiry and apply the standard set forth in *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), in assessing the severity of Plaintiff's impairments during the relevant period, including her obesity and muskoskeletal problems.

**SO ORDERED**, on this the 20th day of October, 2008.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE